# 14-2920-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



INTERCEPT PHARMACEUTICALS, INC.,

*Plaintiff-Counter-Defendant-Appellee,*

*v.*

CHRIS HOWARD,

*Defendant-Counter-Claimant-Appellant.*

———————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-COUNTER-CLAIMANT-APPELLANT

GORDON & REES, LLP
*Attorneys for
   Defendant-Counter-Claimant-Appellant*
90 Broad Street, 23rd Floor
New York, New York 10004
212-269-5500

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES PRESENTED.............................................3

STATEMENT OF THE CASE................................................................4

STATEMENT OF FACTS .....................................................................6

      A.    Howard's Employment With Intercept and Grant of
          Stock Options ......................................................................6

      B.    Howard's Termination and Severance Benefits Under the
          Termination Agreement ......................................................7

      C.    Howard's Exercise of His Intercept Stock Options ............9

      D.    Howard's Payment for His Intercept Stock .......................10

      E.    Intercept's Silence Following December 31, 2007 ...........12

      F.    In January 2014, Howard Requested Delivery of His
          Intercept Stock but Intercept Refused, Thereby Breaching
          the Termination Agreement ...............................................13

      G.    The Present Lawsuit and the Decision Below...................14

SUMMARY OF THE ARGUMENT ....................................................15

STANDARD OF REVIEW ..................................................................18

ARGUMENT .......................................................................................19

I.      NEW YORK LAW GOVERNS THIS CASE .............................19

II.     HOWARD ADEQUATELY PLED A PLAUSIBLE CLAIM
       FOR BREACH OF CONTRACT ..............................................20

III.    ANY CONTRACT AMBIGUITY MUST BE RESOLVED IN
       HOWARDS' FAVOR AT THIS STAGE....................................23

IV.     THE DISTRICT COURT'S FAILURE TO ACCEPT
       HOWARD'S WELL-PLEADED ALLEGATIONS AS TRUE
       WAS AN ABUSE OF DISCRETION .......................................25

V.      THE DISTRICT COURT'S CONCLUSION IN RESPECT OF
       THE STATUTE OF LIMITATIONS WAS INCORRECT .........29

VI.    HOWARD ADEQUATELY PLED A CLAIM FOR
DECLARATORY RELIEF ......................................................................... 34

CONCLUSION ............................................................................................................ 36

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Aetna Life & Cas. Co. v. Nelson*
  81 N.Y.2d 399 (1993)................................................................29

*Anderson News, L.L.C. v. Am. Media, Inc.*
  680 F.3d 162....................................................................................26

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ......................................................................18

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*
  692 F.3d 42 (2d Cir 2012) ....................................................... 20, 28

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 544 (2007) ........................................................ 18, 26, 28

*Elden v. Merril Lynch, Pierce, Fenner & Smith, Inc.*
  No. 08 Civ. 8738 (RJS), 2001 U.S. Dist. LEXIS 35886 ....................19

*Hayden v. Paterson*
  594 F.3d 150 (2d Cir. 2010) ..........................................................18

*Hermanowski v. Acton Corp.*
  729 F.2d 921 (2d. Cir. 1984) ..................................................... 30, 31

*Kapsis v. Am. Home Mortg. Servicing Inc.*
  923 F. Supp. 2d 430 (E.D.N.Y. 2013)...........................................20

*Klaxon Co. v. Stentor Elec. Mfg. Co.*
  313 U.S. 487, 496, 85 L. Ed. 1477,
  61 S, Ct, 1020 (1941) ......................................................................19

*L-7 Designs, Inc. v. Old Navy, LLC*
  647 F.3d 419 (2d Cir. 2011) ..................................................... 18, 22

*Lubicz v. Rosen*
  54 A.D.2d 894, 388 N.Y.S.2d 16 (2d Dep't 1976)...........................35

*Maxim Group LLC v. Life Partners Holdings, Inc.*
  690 F. Supp. 2d 293 (S.D.N.Y 2010)...............................................30

*Mellon Bank N.A. v. United Bank Corp.*
  31 F.3d 113 (2d Cir. 1994) ............................................................23

*Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*
  No. 06 Civ. 4624, 2008 U.S. Dist. LEXIS 35319 ................................35

*Rossi v. Oristian*
  50 A.D.2d 44 (N.Y.Sup. Ct. 1975)....................................................32

*Skrodelis v. Norbergs*
  707 N.Y.S.2d 197 (N.Y. App. Div. 2000)........................................35

*Zurich Am. Ins. Co. v. Paxson Commc'ns Corp.*
  No. 03 Civ. 1503, 2004 U.S. Dist. LEXIS 9093
  (S.D.N.Y. May 19, 2004) ................................................................35

## **Statutes**

28 United States Code
  Section 1291 ....................................................................................2

28 United States Code
  Section 1332 ....................................................................................1

New York Code - Civil Practice Law and Rules
  Section 203 ....................................................................................29

New York Code - Civil Practice Law and Rules
  Section 213 ....................................................................... 3, 17, 29

## **Rules**

Federal Rule of Civil Procedure
  Rule 4.................................................................................................2

Federal Rules of Civil Procedure
  Rule 12................................................................... 3, 5, 15, 17, 18

Federal Rules of Civil Procedure
  Rule 8...............................................................................................20

## JURISDICTIONAL STATEMENT

A.    The jurisdiction of the District Court was based on 28 U.S.C. § 1332(a) in that the action was a civil action between citizens of different states and the amount in controversy exceeded the sum of $75,000, exclusive of interest or costs. (A 10, 57, 64.).[1]  The citizenship of the parties to the District Court action was as follows:

  1) Plaintiff-Counter-Defendant-Appellee Intercept Pharmaceuticals, Inc. ("Intercept"), a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York; and,

  2) Defendant-Counter-Claimant-Appellant Chris Howard ("Howard"), a citizen of Texas.  (A 10, 57, 64.).

Howard demanded specific performance of the delivery of 108,000 shares of Intercept common stock to Howard at the price of $.050 per share; or, for compensatory damages in the amount of the market value of the 108,000 shares of Intercept stock to which Howard was entitled, minus the $54,000.00 payment

---

[1] The Joint Appendix will be cited as "(A __.)"

price, at the approximate trading price at the time of the breach of between $440 and $450 per share for a sum at or exceeding $47,520,000.[2] (A 71-73.).

B.     The jurisdiction of the Court of Appeals is based on 28 U.S.C. § 1291, in that the appeal is taken from a final decision of a District Court of the United States.  Final judgment in the underlying case, disposing of all claims remaining at that time as to all remaining parties, was entered on August 6, 2014.  (A 216.).

C.     This appeal is timely in that Howard filed his notice of appeal on August 14, 2014, 9 days after judgment was entered in the District Court on August 6, 2014, or within the time limit prescribed by Rule 4(a)(1)(A) and (4)(A).  (A 217.).

D.     Howard asserts that this appeal is from a final judgment that disposes of all parties' claims.

---

[2] Although a 1-for-5.7778 reverse stock split, which apparently occurred in September 2012, would have reduced the number of Howard's shares from 108,000 to approximately 18,692 shares, at approximately $440 per share on the date of Intercept's breach of contract in January 2014, those shares would still have been valued at over $8.2 million, which is well in excess of the jurisdictional minimum.

## STATEMENT OF ISSUES PRESENTED

1.      Whether the District Court exceeded the scope of its authority under Federal Rules of Civil Procedure 12(c) by failing to accept as true Howard's factual allegations that he sent his stock options payment check to Intercept timely on December 26, 2007, by first class mail, in the amount of $54,000 and that Intercept received the check.

2.      Whether Howard's breach of contract claim "accrued" in January 2014 when, for the first time, Howard demanded delivery of the Intercept stock he had exercised and Intercept refused to deliver the stock, and is therefore timely under N.Y. C.P.L.R. §213 (2).

## STATEMENT OF THE CASE

This action concerns the exercise of stock options that were governed by an employment termination agreement ("Termination Agreement"). Appellant Chris Howard ("Howard") is the former Director of Clinical Operations for Appellee Intercept Pharmaceuticals, Inc. ("Intercept"), a biopharmaceutical company located in New York and founded in 2002. During Howard's employment with Intercept from 2005 to 2007, Intercept provided Howard the option to purchase 108,000 shares of Intercept common stock at $0.50 per share. (A 39.).

In 2007, Howard was terminated by Intercept and the parties entered into the Termination Agreement providing for certain severance benefits to Howard in exchange for a general release, including the right for Howard to exercise his vested stock options at any time until December 31, 2007 at 5:00 p.m. (all times referenced herein refer to New York City time). (A50-54.).

Howard validly exercised his stock options pursuant to the Termination Agreement by sending Intercept a completed Notice of Stock Option Exercise form in October 2007 (A 75-76.), which Intercept acknowledged it received, and by thereafter sending a check *via* First Class U.S. Mail to Intercept on December 26, 2007 in the amount of $54,000.00 (A 77.), which Howard alleges Intercept received on or before December 31, 2007 at 5:00 p.m. (A 60.).

Following Howard's exercise of his stock options, there was no communication between Howard and Intercept until January 2014, when, for the first time, Intercept stock obtained significant market value, thus causing Howard to demand delivery of the shares he had purchased. (A 69-70, 80-86.). In response, and for the first time, Intercept claimed it had not received Howard's payment by December 31, 2007 at 5:00 p.m. and refused to honor Howard's request. (*Id.*). Instead, Intercept filed suit against Howard for declaratory relief (A 9-54.), which Howard answered and also asserted counter-claims for declaratory relief and compensatory damages. (A 56-109.). Intercept then filed a motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) arguing that Howard failed to plead the elements of a breach of contract action and that Howard's claims are time-barred by New York's six year statute of limitations for breach of contract claims. (A 134-163.).

This appeal arises from the District Court's Order granting Intercept's motion for judgment on the pleadings. Judge Alvin K. Hellerstein of the United States District Court for the Southern District of New York granted Intercept's motion for judgment on the pleadings and entered judgment based thereon on August 6, 2014. (A 209-16.). Following the District Court's Order, Howard filed a timely Notice of Appeal on August 14, 2014. (A 217.). The District Court's Order has not been reported in an official reporter.

## STATEMENT OF FACTS

Appellant Howard is the former Director of Clinical Operations for Appellee Intercept, a New York-based biopharmaceutical company founded in 2002 by Mark Pruzanski ("Pruzanski"), who has been Intercept's President and Chief Executive Officer at all times since the company's founding.

### A. Howard's Employment With Intercept and Grant of Stock Options

Howard began working as a consultant for Intercept on or about April 1, 2005, assisting in the development of pharmaceutical drugs for the treatment of liver, gastrointestinal, metabolic, and other diseases. (A 11, 57, 64, 111.). On or about September 1, 2005, Howard and Intercept entered into an "Amended and Restated Consulting Agreement" ("Consulting Agreement"). (A 65, 99-106.) The Consulting Agreement provided Howard with an option to purchase 108,000 shares of Intercept Common Stock at $0.50 per share. (A 65, 100.) The option provided that it was subject to the terms and conditions of the Stock Option Agreement that Intercept and Howard planned to agree to after execution of Howard's Consulting Agreement. (A 100.).

On or about August 9, 2006, Intercept entered into an employment agreement with Howard, hiring Howard as Intercept's second full-time employee with the title of Director of Clinical Operations. (A 37- 42.). The employment

agreement between Intercept and Howard re-affirmed the grant of stock options that had been made to Howard under the Consulting Agreement.  (A 39-40.).

Howard was employed by Intercept as its Director of Clinical Operations until approximately July 23, 2007.  During the period of Howard's employment with Intercept, Howard's stock options became fully vested.  (A 12, 65.).

**B.**   **Howard's Termination and Severance Benefits Under the Termination Agreement**

On or about July 23, 2007, Howard and Intercept decided to part ways.  In connection with the termination of Howard's employment, Intercept sent to Howard a termination letter and the Termination Agreement setting forth Howard's severance benefit options.  (A 50-54, 65-66.).  Intercept's termination letter stated that if Howard refused to sign and return the Termination Agreement, Howard would "not receive any severance benefits from the Company," but if Howard did agree to sign the Termination Agreement, which he did, he would be entitled to receive the severance benefits set forth in the Termination Agreement. (A 50.).

The manner in which Howard could exercise his vested Intercept stock option following his termination is one of the topics covered in the termination letter and Termination Agreement.  The termination letter provided that if Howard refused to sign the Termination Agreement, the manner in which he could exercise his vested stock option would remain subject to the company's stock incentive plan

-7-

and stock option plan, and accordingly, Howard would only have "up to ninety (90) days after the Termination Date to exercise any vested stock rights [he] may have (as provided for by the plans)." (A 50.). However, if Howard signed the Termination Agreement, which he did, the manner of execution of his stock option would be governed by the Termination Agreement – not the stock incentive plan and stock option plan – and pursuant to the terms of the Termination Agreement, Howard would be given "until 5:00 p.m. (New York City time) on December 31, 2007 to exercise the vested portion of [his] options to purchase shares of the Company's common stock." (A 51.).

The "Entire Agreement" provision in paragraph 14 of the Termination Agreement made it clear that the Termination Agreement "constitutes the entire understanding and agreement between the parties hereto with respect to [Howard's] severance benefits and the settlement of claims against the Company and cancels all previous oral and written negotiations, agreements and commitments in connection therewith." (A53-54.).

The "Applicable Law" provision in paragraph 13 of the Termination Agreement stated that the agreement "shall be interpreted and construed by the laws of the State of New York without regard to conflict of laws provisions" and required that New York state or federal courts are the "only courts of competent jurisdiction" over any claims arising out of the Termination Agreement. (A 53.).

-8-

Howard signed the Termination Agreement on August 1, 2007 and returned it shortly thereafter, thereby availing himself of the severance benefits described in the Termination Agreement, of which there is no issue.  (A 54.).

## C.  **Howard's Exercise of His Intercept Stock Options**

On October 9, 2007, Howard contacted CEO Pruzanski and Intercept's Director of Operations, Nora White ("White"), notifying and informing them that he intended to exercise his stock options pursuant to the Termination Agreement, and he requested whatever forms he might need to effectuate the exercise.  There was some confusion as to what was required of Howard in order to exercise his stock options because the Termination Agreement does not contain any provision defining the term "exercise."  (A 90-91.).

In response, on October 12, 2007, White provided a breakdown of the payment amount that would be due in connection with the exercise of Howard's vested stock options, and provided Howard with a copy of a Notice of Stock Option Exercise form with the caveat, "If that is not what you were looking for, please let me know."  (A 90.).

After receiving White's correspondence and reviewing the Notice of Stock Option Exercise form, Howard was still unsure as to the actual steps he needed to follow to exercise his stock options, so he sent a follow-up email to White seeking further explanation.  (A 89-90.).  When White failed to respond, Howard

-9-

forwarded this email to Pruzanski on October 13, 2007. (A89-90.). Pruzanski responded on October 13, 2007 that he was "happy to hear you're exercising your options" and that he would inquire within the company as to "what the procedure is for exercising." (A 89.).

On October 21, 2007, Howard sent a reminder email to Pruzanski and requested confirmation that Howard would have until December 31, 2007 to exercise his options. (A 89.). Pruzanski responded, "On the options, the deal was that we can do all the paperwork and if you need more time to make payment then no problem getting it done by the end of the year…" (A 88-89.) In response, Howard emailed Pruzanski back that same day and asked: "OK, does that mean, I send in the completed form, and no check?" (A 88.). Pruzanski replied the same day, "Yes, please do and just maybe send us an email saying you'll get us the payment before the end of the year. M." (A 88.).

Based on Pruzanski's instructions on how to exercise his stock options, Howard filled out and returned the Notice of Stock Option Exercise form to Intercept on October 30, 2007, but did not include payment at that time. (A75-76.).

**D.**     **Howard's Payment for His Intercept Stock**

On December 21, 2007, Howard received an email from White in which she stated that she "just wanted to let you know that the office will be closed next week

so if you are going to send a check for executing those options (which should be done by 12/31), please give me a heads up – I'll be checking the mail every couple days." (A93-94.)

On December 26, 2007, Howard mailed a check for $54,000.00 to Intercept (drawn from Howard's wife's separate bank account) by First Class Mail as payment for his shares of Intercept common stock. A carbon copy of the payment check was attached to Howard's Answer and Counterclaim. (A 77.).

The next day, Howard received an email from Pruzanski, which stated in part, "Just wanted to remind you to get payment in for your stock options for the end of the year." (A 96.). That same day, Howard also received another email from White which stated "I don't know if you saw my other message about the option exercise and I certainly don't want to bother you during the holidays – I'm just following up to see if you still plan to send a check for your option exercise. I believe we should be in receipt of it by 12/31 and I don't want you to [sic] the deadline. I honestly don't know if getting it later would be any problem – I doubt if the check is dated before end of year, but please let me know what you plan to do if you have a chance." (A 95.). Because he already had put the check in the mail the day before, Howard felt no need to respond to these e-mails.

**E.**     **Intercept's Silence Following December 31, 2007**

Howard did not receive any communication from Intercept after December 27, 2007 regarding his purchase of 108,000 shares of Intercept common stock. Based on the earlier pattern of correspondence between Howard and Intercept – and in particular Howard's execution of the Notice of Stock Option Exercise – Howard understood Intercept's silence as confirmation that Intercept had in fact received his $54,000.00 payment check sent by First Class Mail.

The fact that Intercept did not contact Howard did not concern Howard because the Notice of Stock Option Exercise form included a disclaimer from Intercept indicating that the shares Howard was purchasing were "restricted securities," meaning that they were not "registered" and Howard would not be entitled to dispose of them unless and until Intercept registered the shares as part of an initial public offering, which as of 2007-08, Intercept had "no obligation or current intention" to undertake.  (A 75-76.).  Accordingly, as stated in the form, Howard understood that his shares might have no value for "an indefinite period." (A 75-76.).  Further, the Termination Agreement did not include any provision specifying a deadline for delivery of the stock certificate by Intercept.  (*See* A 50-54.).

**F.      In January 2014, Howard Requested Delivery of His Intercept Stock but Intercept Refused, Thereby Breaching the Termination Agreement**

On January 9, 2014, Intercept issued a press release claiming it had achieved successful results from clinical trial testing of the efficacy of Intercept's drug obeticholic acid (OCA) for the treatment of nonalcoholic steatohepatitis (NASH), a serious chronic liver disease caused by excessive fat accumulation in the liver. (A108-09.).

Howard happened to see the press release, and noticed that Intercept had apparently undergone an IPO and was now listed on the New York Stock Exchange.  The positive test results caused Intercept's stock value to increase dramatically and on January 13, 2014 Howard and his wife contacted Pruzanski to obtain physical delivery of the stock certificates so that they could sell some or all of their shares, at their discretion.  Pruzanski referred the Howards to Intercept's Director of Legal Affairs, Bryan Yoon ("Yoon").  (A 85.).  In response to the Howards' request, Yoon initially responded that it appeared Howard's stock options had expired.  (A 84-85.)  After further review of Intercept's internal records, Yoon notified Howard that Intercept was denying Howard's request, refusing to honor Howard's valid exercise of his stock options based on Yoon's claim that "I have internal emails from January 2008 showing we hadn't received the check until after the expiration period."  (A 81.).

-13-

**G.**     **The Present Lawsuit and the Decision Below**

In response to the Howard's correspondence, Intercept refused to provide any of its internal records regarding Howard's stock options.  Instead, Intercept filed a Complaint for Declaratory Judgment on March 4, 2014, in which Intercept alleged that it did not receive Howard's $54,000.00 check.  (A 9-54.).  Howard filed an Answer and Counterclaim for Declaratory Relief and Breach of Contract on March 21, 2014.   (A 57-109.)

On June 2, 2014, Intercept filed a motion for judgment on the pleadings, requesting an order (1) dismissing Howard's counterclaim, and (2) entering judgment in favor of Intercept on its declaratory judgment claim.  (A 134-63.).  Howard filed an opposition to the motion on June 18, 2014 (A 164-85.) and Intercept filed a reply memorandum on June 30, 2014.  (A 186-207.).  Although the District Court initially set oral argument on the motion for August 6, 2014 (A 6.), the Court issued an order two days prior to oral argument, granting the motion without oral argument by Order dated August 4, 2014 (A 209-15), which Order was entered on August 6, 2014. (A 216.).   Howard filed a timely Notice of Appeal on August 15, 2014.  (A 217.).

-14-

## <u>SUMMARY OF THE ARGUMENT</u>

The District Court's granting of Intercept's motion for judgment on the pleadings was in error because the District Court misapplied Federal Rule of Civil Procedure 12(c).  Despite the District Court's acknowledgment that "[a] motion for judgment on the pleadings under FED. R. CIV. P. 12(c) is governed by the same standard as a motion to dismiss,"  (A 212.) and that pursuant to that standard, "[t]he court accepts all well pleaded allegations as true," (A 212) Judge Hellerstein's order nevertheless improperly disregarded Howard's plausible claims and ruled that "Intercept is entitled to judgment on its claim that it has no rights or obligations owed to Howard regarding his stock option."  (A 215.).

Judge Hellerstein committed two fatal errors.  First, he improperly weighed the disputed facts to make factual determinations.  Judge Hellerstein should not have performed *any* weighing process at all; that is not the function of the court on a Rule 12(c) motion.  Second, Judge Hellerstein compounded this mistake by deciding key factual disputes in favor of Intercept, in clear violation of the Rule 12(c) standard.  The dispute at the heart of the case is whether Howard validly exercised his stock options.  Howard has alleged more than sufficient factual matter to state a plausible claim that he validly exercised his stock options by sending Intercept a complete Notice of Stock Option Exercise, and the requisite payment of $54,000, on or before December 31, 2007.  Intercept concedes it

-15-

received the Notice of Stock Option Exercise (A 114), but denies that it received

the payment check for $54,000. (A 116.). Howard alleges he sent a check *via* U.S.

Mail to Intercept in the amount of $54,000 on December 26, 2007. (A 68.) In

support, Howard possesses a carbon copy of the mailed check and, if discovery is

permitted to go forward, Howard's wife also will testify as an eyewitness to the

mailing of the check. (A 77.). The key fact overlooked by Judge Hellerstein is

that everyone involved knew that Howard intended to exercise his stock options.

Howard alleges that Intercept's internal records will confirm what the Yoon email

noted above indicates, that Intercept received the payment check by December 31,

2007 and may not have realized that it possessed the check until shortly thereafter

because the office was closed for several days at the end of the year (A 16.);

however Howard will not be able to obtain such documents absent a full and fair

discovery process.

The District Court's ruling was based on Judge Hellerstein's improper

weighing of the parties' factual allegations in Intercept's favor to conclude that

Howard's well-pleaded factual "claim[] that he mailed his check to Intercept

timely on December 26, 2007, by first class mail, in the amount of $54,000 . . . .

stretches logic too far." (A 212.) The District Court was not entitled to reach this

conclusion, and in doing so failed to follow the well-settled standard for motions

pursuant to Rules 12(b)(6) and 12(c) that all factual allegations must be accepted as true in favor of the non-movant.

Judge Hellerstein's improper balancing of the allegations against Howard also led to the District Court's further conclusion that Howard's claim was barred by New York's six-year statute of limitations for breach of contract claims. (A 215.). *See* N.Y. C.P.L.R. §213 (2). Although Judge Hellerstein's order recognizes that "the statute of limitations begins to accrue when the person granted the option demands the stock," Judge Hellerstein incorrectly held that "[t]his does not help Howard … because Intercept disputes that he effectively exercised the option." (A 214, n.4) This determination misstates the law and is wrongly based on an assessment of the facts in favor of Intercept. If the District Court took Howard's factual allegations as true, as is required by the 12(c) standard, it would have had to conclude that Howard's claim was timely and not barred by the six-year statute of limitations because Howard's claim did not accrue until Howard demanded and Intercept refused to deliver the stock, in 2014.

In short, this case should not have been decided on the pleadings because Howard has set forth a plausible claim for relief. This case should be remanded to allow discovery to go forward and the matter be litigated in the normal course.

## **STANDARD OF REVIEW**

The Court of Appeals reviews *de novo* a district court's decision to grant a motion for judgment on the pleadings. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

The standard for deciding a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Id.* In each case, the court must accept as true the complaint's factual allegations and draw all inferences in the plaintiff's favor. *Id.* The allegations in a complaint must meet a standard of "plausibility." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that [plaintiff is entitled to relief]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "On a 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy*, LLC, 647 F.3d 419, 422 (2d Cir. 2011).

-18-

**ARGUMENT**

## I. NEW YORK LAW GOVERNS THIS CASE

As the District Court found below, New York law is controlling in this case. (A 213-14.). A federal court sitting in diversity applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941). Here, New York's choice of law rules apply, and pursuant to those rules the Termination Agreement's choice of law provision controls because it is the only contract which was in effect at the time of Howard's attempted exercise, and Intercept's breach, and it thus "governed the activity that lies at the heart of this case." *Elden v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, No. 08 Civ. 8738 (RJS), 2001 U.S. Dist. LEXIS 35886, at *14 (resolving competing choice of law provisions in contract action in favor of application of New York law).

The Termination Agreement contains an "Applicable Law" provision, which states in relevant part, "[t]his letter agreement shall be interpreted and construed by the laws of the State of New York, without regard to conflict of laws provisions." (A 53.). The Termination Agreement's "Entire Agreement" provision indicates that, upon execution, it contains the "entire understanding and agreement between the parties … with respect to [Howard's] severance benefits", and that it "cancels all previous oral and written negotiations, agreements and commitments in

-19-

connection therewith." (A 53-54.). Thus, following execution of the Termination Agreement, the contractual relationship between Intercept and Howard regarding Howard's severance benefits was and is governed by the Termination Agreement.[3] Accordingly, New York law governs this case.

## II.    HOWARD ADEQUATELY PLED A PLAUSIBLE CLAIM FOR BREACH OF CONTRACT

Howard has pled sufficient facts to state a plausible cause of action for breach of contract. Breach of contract claims are subject to Federal Rules of Civil Procedure 8(a), which requires only a "short and plain statement of the claim." Fed. R. Civ. P. 8(a); *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 64 (2d Cir 2012) (reversing a district court's motion to dismiss a complaint for breach of contract and gross negligence).

To plead a breach of contract claim under New York law, a party must allege "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 450 (E.D.N.Y. 2013).

---

[3] It is undisputed that Howard's stock options had already vested before he signed the Termination Agreement. Accordingly, as will be discussed in further detail below, the Entire Agreement provision of the Termination Agreement could not and did not divest Howard of his vested stock options; it merely governed the manner of exercise of his stock options.

-20-

Howard properly has alleged each of the required elements.  First, Howard has alleged the existence of the contract, *i.e.*, the Termination Agreement, and has set forth its essential terms and has included a copy of the contract.  (A 64-71.). Second, Howard has alleged that he performed under the Termination Agreement by exercising his vested stock options and completing all necessary conditions precedent for performance by Intercept.  *Id*.  Third, Howard has alleged that despite his own performance, Intercept did not perform, breaching the contract "by refusing to deliver Howard's shares of stock" when requested in 2014.  *Id*.  Finally, Howard has alleged that the consequences of Intercept's non-performance have damaged him far in excess of the minimum jurisdictional amount.  *Id*.  This is all that is required at the pleading stage.

Intercept argued in the District Court that the Termination Agreement was not the controlling contract regarding Howard's stock options and that Howard failed to allege performance adequately under the earlier contracts.  In particular, Intercept argued that despite the "Entire Agreement" provision of the Termination Agreement, the earlier 2003 Stock Option Plan ("2003 Plan") and 2005 Stock Option Agreement ("2005 Agreement") still governed Howard's stock options following his termination because those are the only contracts "governing the grant of stock options."  (A 190.).  Building on this faulty premise, Intercept argued that if the Termination Agreement superseded the Stock Option Agreement or the

-21-

Stock Option Plan as alleged by Howard, then Howard's stock options would be null and void. *Id.* This argument is unavailing.

Intercept ignores the simple fact that the *grant* of a stock option is not the same thing as the *exercise* of a stock option. The Termination Agreement plainly did not supersede any prior agreements regarding the *grant* of stock options, only the manner in which vested stock options were to be *exercised*. (A 50-54.). The Termination Agreement was the controlling agreement with respect to the manner of exercise of Howard's previously granted and vested stock options and Howard adequately pled compliance with its terms.

Moreover, even assuming *arguendo* that Intercept's interpretation of the agreements is the correct one, Howard would still have stated a plausible claim for relief under those contracts because Howard's answer and counterclaim alleges sufficient factual matters that if assumed true, would satisfy the exercise requirements even of the Stock Option Agreement and Stock Incentive Plan – *i.e.*, that Intercept actually received Howard's check on or before December 31, 2007. (*E.g.*, A 60.). The District Court was required to accept this well-pleaded allegation as true and the Second Circuit has previously reversed district courts on the precise basis that it made factual determinations on the pleadings and "without the benefit of discovery or expert testimony." *L-7 Designs*, 647 F.3d at 434 n.16. This Court should do so again here.

-22-

**III.  ANY CONTRACT AMBIGUITY MUST BE RESOLVED IN HOWARDS' FAVOR AT THIS STAGE**

Intercept's motion for judgment on the pleadings should have failed for the additional reason that it required the Court to accept Intercept's opinion regarding the meaning of ambiguous contract terms.  It is well-settled that if a contract is deemed ambiguous, it is not subject to decision on a motion for judgment on the pleadings.  *See Mellon Bank N.A. v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994).  Here, to the extent the multiple contracts and e-mail communications present ambiguity, it should not have been resolved on an incomplete record.  For example, although Intercept claims to know what the 2003 Intercept Stock Plan and the 2005 Howard Stock Option Agreement "unambiguously provide", (A 109.) Intercept's argument ignores the ambiguity as to the application of those earlier agreements and the impact of the subsequent execution of the Termination Agreement.

Moreover, even within the termination letter there is ambiguity and dispute regarding the meaning of the material term "exercise".  In particular, the termination letter states:  "[i]f you choose not to sign and return this letter agreement … you will have up to ninety (90) days after the Termination Date to exercise any vested stock rights you may have (**as provided for by the plans**)." (A 50 (emphasis added).).  By comparison, the Termination Agreement provides, "if you timely sign and return this letter agreement, … you will have until 5:00

-23-

p.m. (New York City time) on December 31, 2007 to exercise the vested portion of your options to purchase shares of the Company's common stock." (A 51.). Notably absent from the Termination Agreement option is any provision requiring that stock rights be exercised "(as provided for by the plans)." *Id*. The absence of this language from the Termination Agreement – the option chosen by Howard – may plausibly be inferred as an acknowledgment by Intercept that the stock options provided by the Termination Agreement are not subject to the exercise requirements in the 2003 Plan. This is an ambiguity which cannot be resolved on the pleadings.

Additionally, the limited record of communications between Howard and Intercept leading up to December 31, 2007 only adds to the list of disputed issues of fact. For example, White's email from December 21, 2007 states, "if you are going to send a check for executing these options (which should be done by 12/31), please give me a heads up . . . ." (A 93.), and White's December 27, 2007, states, "I honestly don't know if getting [the check] later would be any problem – I doubt if the check is dated before end of year, but please let me know what you plan to do if you have a chance." (A 95.). These emails could be interpreted as an acknowledgment that Howard's sending of the payment prior to December 31, 2007 at 5:00 p.m. was sufficient, not receipt as now suggested by Intercept. Similarly, Pruzanski's email from October 21, 2007 raises further issues of fact

-24-

which only discovery can clarify. In his October 21, 2007 email, Pruzanski responds to Howard's earlier email in which he had asked, "OK, does that mean, I send in the completed form, and no check?" with the reply that, "Yes, please do and just maybe send us an email saying you'll get us the payment before the end of the year. M." (A 88.). This response by Intercept's CEO, in which he recommends that Howard fill out the Exhibit A Notice of Stock Option Exercise form without payment plausibly could be inferred as an indication that he was simply making up the requirements for exercising options *ad-hoc* because the exercise requirements are not clearly delineated in the Termination Agreement. Again, this factual dispute cannot be resolved absent full discovery and thus the motion must be denied. Moreover, there is no evidence contrary to Howard's allegation that he mailed the $54,000.00 check *via* First Class Mail with his wife as a witness on December 26, 2007.

## IV. THE DISTRICT COURT'S FAILURE TO ACCEPT HOWARD'S WELL-PLEADED ALLEGATIONS AS TRUE WAS AN ABUSE OF DISCRETION

The District Court's failure to accept Howard's well-pleaded allegations as true was reversible error. As the District Court's order recognized, it had a duty to accept all well-pleaded allegations as true. (A 212-13.). Despite this, the District Court failed to accept all of Howard's well-pleaded allegations as true by refusing to accept the allegation that "he mailed his check to Intercept timely on December

-25-

26, 2007, by first class mail, in the amount of $54,000" and that Intercept should have received it. (A 212.). Instead, the District Court made an improper and incorrect factual finding that Howard "has nothing to confirm that assertion – no cancelled check, no email acknowledgment, nothing." *Id.*

This finding by the District Court on a motion for judgment on the pleadings was improper. Judge Hellerstein was not entitled to decide the motion for judgment on the pleadings based on what he perceived to be lack of proof. That is not the function of a motion for judgment on the pleadings. "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Even if Judge Hellerstein felt that it was improbable that Howard could prove that Intercept had received the check, he was required to allow the case to continue to the discovery phase so that the evidence could be adduced.

The District Court's order boils down to its conclusion that Intercept's version of the facts is more plausible than Howard's, which is not a proper finding on a motion for judgment on the pleadings. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 ("A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."). To make a factual finding in

-26-

favor of Intercept on its denial that it received Howard's payment check despite Howard's factual allegations to the contrary is prohibited on a motion for judgment on the pleadings for the obvious reason that it would render the judicial process meaningless if a defendant could escape liability simply by denying the plaintiff's allegations in its answer.

The District Court's ruling is also factually incorrect. Howard *does* have evidence to confirm that he mailed the check to Intercept on December 26, 2007, including a carbon copy of the check, his own testimony, and his wife's eye-witness testimony. (A 77.). Howard also alleges that "Intercept had received his $54,000.00 check sent by First Class Mail" sometime on or about December 31, 2007. (A 69.). Howard's allegation of receipt by Intercept of Howard's check is even more apparent in Howard's Answer to Intercept's Complaint, in which Howard clearly states "Howard mailed the check for $54,000.00 to Intercept on December 26, 2007 by First Class Mail and was never informed by Intercept, prior to January 2014, that Intercept had either received the check later or had not received it at all, and Howard therefore alleges that it was received by Intercept." (A 60 (emphasis in original).). Further, Howard's allegation is buttressed by Intercept's own communications, as the Yoon email makes clear: "I have internal emails from January 2008 showing we hadn't received the check until after the expiration period." (A 82.). By saying "until after", Yoon implicitly confirms the

-27-

plausibility of Intercept's receipt of Howard's check. Intercept may attempt to refute this with other information, or dispute this interpretation, but that is all fodder for discovery and summary judgment, not a motion for judgment on the pleadings.

Howard should be permitted the opportunity to conduct discovery to support and prove these factual allegations. "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [to prove the claim]." *Twombly,* 550 U.S. at 556. The plausibility standard does not require Howard establish what discovery will necessarily reveal. The plausibility standard is met even if "After discovery the facts that come to light … show a different story." *Bayerische Landesbank*, 692 F.3d at 63. Howard has plausibly alleged that his own evidence is likely to be supported further during discovery by eyewitness testimony and documentary evidence in the sole possession of Intercept. The weight of this evidence and the credibility of these witnesses – who have not had the opportunity to testify yet and will never have that opportunity unless this Court reverses the lower court's decision – is *not* for the District Court to decide on a motion for judgment on the pleadings. *See id.* Despite Intercept's wishes and Judge Hellerstein's opinion to the contrary, Howard is not required to prove his case at the pleadings stage, and he is entitled to access to Intercept's internal

-28-

records in order to reveal exactly what transpired. This is precisely why a court must accept all well-pleaded factual allegations as true on a motion for judgment on the pleadings, and why this Court should reverse the ruling below and remand the case for further proceedings.

## V.  THE DISTRICT COURT'S CONCLUSION IN RESPECT OF THE STATUTE OF LIMITATIONS WAS INCORRECT

The District Court's determination that Howard's claim is barred by New York's six-year statute of limitations was erroneous, because Howard's claim did not accrue until January 2014, when he first demanded delivery of the stock and Intercept refused. Until Intercept refused to give Howard the stock certificates he requested, the damage had not yet occurred and the statute had not yet started running.

New York provides a six-year statute of limitations for breach of contract actions. N.Y.C.P.L.R. § 213 (2). Under New York law, a statute of limitations begins to run when a cause of action "accrues" (N.Y.C.P.L.R. § 203 (a)), that is, when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court. *Aetna Life & Cas. Co. v. Nelson*, 81 N.Y.2d 399, 402 (1993).

The leading case interpreting New York law regarding the time at which a breach occurs in a matter involving the failure to deliver stock pursuant to an option agreement is this Court's decision in *Hermanowski v. Acton Corp.*, 729 F.2d

921 (2d. Cir. 1984). In *Hermanowski*, a plaintiff-employee agreed in April 1975 to terminate his employment contract with the defendant-employer in return for a cash payment and a five-year non-qualified stock option. In June 1976, the defendant notified the plaintiff that the stock option had been cancelled. The plaintiff ignored this and in September 1979 attempted to exercise a portion of the stock option by sending a $10,000 check and requesting delivery of 5,000 shares of stock. *Id.* at 922. The defendant-employer returned the check two months later in November 1979, stating that it had determined that the employee had no exercisable stock option. *Id.* The key issue was determining when the breach occurred. This Court upheld the lower court's "carefully drafted opinion" which determined that the breach of the option contract occurred in November 1979, "when the defendant had refused to deliver the stock." *Id.; see also Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 299 (S.D.N.Y 2010) ("Assuming a breach occurred, the date of the breach is … the date [defendant] refused to deliver the shares of stock.") Thus, the rule in New York in cases involving the non-delivery of stock is that a breach occurs when the defendant wrongfully refuses to deliver the stock – not simply when the stock purchase is made.

Here, although Howard purchased the Intercept stock in December 2007, there was no deadline in the Termination Agreement for Intercept to cash

-30-

Howard's check, physically to deliver the stock certificates to Howard, or to register Howard's shares. (*See* A 50-54.) In fact, as to registration, the Notice of Stock Option Exercise that Howard signed on October 30, 2007 specifically contemplates a long and "indefinite period" of delay before the shares would be registered and delivered to Howard. (A 75-76.). The Notice of Stock Option Exercise provides the following additional disclaimer:

> I understand that (i) the Shares have not been registered under the Securities Act and are "restricted securities" within the meaning of Rule 144 under the Securities Act; (ii) the Shares cannot be sold, transferred or otherwise disposed of unless they are subsequently registered under the Securities Act or an exemption from registration is then available; (iii) in any event, the exemption from registration under Rule 144 will not be available for at least one year and even then will not be available unless a public market then exists for the Common Stock, adequate information concerning the Company is then available to the public, and other terms and conditions of Rule 144 are complied with; and (iv) there is now no registration statement on file with the Securities and Exchange Commission with respect to any stock of the Company and the Company has no obligation or current intention to register the Shares under the Securities Act.

(A 76.). Howard reasonably relied upon this language. He accepted there would be a substantial and indefinite time period before the shares he purchased would be available to him, because no public market existed, and because Intercept had neither registered nor intended to register the shares with the SEC, until Intercept had completed an IPO, which did not happen until 2012.

In its decision, the District Court ignored *Hermanowski* and instead held that "even assuming as Howard alleges, that he mailed the check to Intercept on

December 27, 2007 and that it was received by Intercept before the December 31, 2007 deadline, his claim would have accrued, at the very latest possible date, on December 31, 2007, more than six years before he filed his counterclaim on March 31, 2014." (A 214.). The only authority cited for the District Court's position was a footnote in which it cited to *Rossi v. Oristian,* 50 A.D.2d 44 (N.Y.Sup. Ct. 1975), a case which neither of the parties had cited in their briefing. (A 214, n.2.) The District Court held that under *Rossi*, "the statute of limitations begins to accrue when the person granted the option demands the stock," but only "[i]f the relevant parties concede that an option was effectively exercised." *Id.* The District Court's holding that the statute of limitations only accrues at the time of a party's demand for the delivery of stock if the supplying party first concedes that the option was effectively exercised is not supported by the *Rossi* opinion and makes little sense. Under the District Court's logic, the outcome of a statute of limitations issue depends not on the specific facts and circumstances of a particular matter and when a person claiming harm was in fact damaged, but instead upon whether a defendant agrees that the plaintiff met those pre-conditions. No defendant would ever agree that the plaintiff satisfied all pre-conditions, and thankfully this is not the law. A defendant's mere refusal to concede liability is not a proper basis upon which to deny a plaintiff's meritorious claim. The District Court's holding makes even less sense at the pleading stage, because regardless of whether Intercept concedes that

-32-

Howard's option was effectively exercised, the District Court is required to accept Howard's well-pleaded allegation as true.

Intercept *never* communicated any refusal to deliver Howard's stock prior to January 2014. Accordingly, the statute of limitations did not accrue until January 2014, when Intercept first refused Howard's demand for delivery of the stock, and which is thus the first time Howard suffered damages.

Despite Intercept's arguments regarding the "notice" supposedly conferred by the December 27, 2007 email, in a tacit admission that Howard could not possibly have received such notice until sometime after December 31, 2007, Intercept suggested in its motion that Howard should have been "on notice" that he was not an Intercept shareholder upon receipt of his "December 2007 bank statement showing the continued presence of the $54,000.00 he claims to have paid Intercept." (A 152-53.). This claim is clearly without merit for the simple reason that there was no deadline in the Termination Agreement for Intercept to cash Howard's payment check. For Intercept to have put Howard "on notice" that it did not consider him a shareholder, Intercept would have had to communicate this fact to Howard at some point after December 31, 2007, which it did not do. Intercept clearly knew Howard had completed or wanted to complete the purchase of the stock options. If there was ever any issue as to Intercept's receipt of the Howards'

-33-

check, Intercept could easily have called or emailed Howard to clarify any such issue it may have had.

Moreover, Intercept's claim that Howard has no evidence that Intercept ever cashed the exercise payment is disingenuous at best. None of the relevant agreements contains a condition requiring Howard to ensure that Intercept cashed his check by a date-certain. The contracts only required that Howard exercise his option and make payment – both of which he did, and clearly claims he did in his pleadings.

## VI.  HOWARD ADEQUATELY PLED A CLAIM FOR DECLARATORY RELIEF

The District Court did not address Howard's claim for declaratory relief. (A 209-15.) Intercept's claim was not that Howard failed to plead the requisite elements necessary for a cause of action for declaratory relief, but rather that Howard's declaratory relief claim is "redundant." (A 153-54.) Even if Howard's counterclaim for breach of contract ultimately may prove to be identical to its counterclaim for declaratory relief, the Court nevertheless should decline to dismiss one (or the other) of these causes of action at this stage. "While the facts underlying both the [breach of contract] and [declaratory judgment claims] may be identical and while both claims may ultimately prove to be coextensive, it is . . . well-established that declaratory relief is alternative or cumulative and not

-34-

exclusive or extraordinary." *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, No. 06 Civ. 4624, 2008 U.S. Dist. LEXIS 35319, at *6 n.7 (S.D.N.Y. Apr. 30, 2008) (quoting *Zurich Am. Ins. Co. v. Paxson Commc'ns Corp.*, No. 03 Civ. 1503,2004 U.S. Dist. LEXIS 9093, at *6 (S.D.N.Y. May 19, 2004)). The Court should "preserve its ability to exercise its discretion to provide declaratory relief . . . at the appropriate time." *Zurich*, 2004 U.S. Dist. LEXIS 9093, at *6. Accordingly, the Court should recognize Howard's right to plead alternatively and cumulatively, and deny Intercept's motion outright.

Relatedly, Intercept's attempt to plead laches is misplaced. (A 155.) Laches is an equitable doctrine which bars the enforcement of a right where there has been an unreasonable and inexcusable delay resulting in prejudice to a party. *Skrodelis v. Norbergs*, 707 N.Y.S.2d 197, 198 (N.Y. App. Div. 2000). The mere lapse of time without a showing of prejudice will not sustain a defense of laches. *Id.* Laches will not bar recovery where there is a reasonable excuse for one's failure to take action in the assertion of his or her rights. *Lubicz v. Rosen*, 54 A.D.2d 894, 388 N.Y.S.2d 16 (2d Dep't 1976) (holding that a combination of circumstances made laches inappropriate as a bar to suit).

Here, as discussed above, Howard did not sleep on his rights. Rather, he exercised his rights regarding his investment, and, as is the case with nearly any long term privately held investment, he waited for the circumstances to be

-35-

favorable for him to make a profit on his investment, as he agreed to do pursuant to the disclaimer in the Notice of Stock Option Exercise referenced above. He agreed to be patient, and he was. The lapse of time between Howard's communications with Intercept was merely a function of waiting until the investment was registered, public, and of sufficient value to warrant a sale. Intercept attempts to cast Howard in a negative light by characterizing him as "laying in wait." (A 155.). However, this is precisely what Howard had specifically agreed to do when he exercised his Notice of Stock Option Exercise: to exercise his option to purchase the stock and then patiently wait, hoping that the stock would one day be registered and brought public through an IPO and thus have marketable (and significant) value. Howard bore the risk that such shares would never attain value and his investment be fully lost. Intercept now seeks to rid Howard of the benefit of his risk. Equity heavily favors Howard in this situation and certainly on the pleadings at this stage.

## **CONCLUSION**

It is respectfully submitted that this Court should reverse the decision of the District Court granting Intercept's motion for judgment on the pleadings, and

-36-

remand this case to the District Court for pre-trial discovery.

Dated: New York, New York
        December 1, 2014

                                        _/s/Mark A. Beckman_____
                                        Mercedes Colwin
                                        Mark A. Beckman
                                        Gordon & Rees LLP
                                        90 Broad Street
                                        New York, NY 10024
                                        (212) 269-5500
                                        mcolwin@gordonrees.com
                                        mbeckman@gordonrees.com

On the Brief:

Stuart Gordon, Esq.
James K. Holder, Esq.

## **CERTIFICATE OF COMPLIANCE**

I, Mark A. Beckman, attorney of record for Defendant-Counter Claimant-Appellant  Chris Howard do hereby certify that the foregoing brief complies with the type-volume limitation as set forth in FRAP 32(a)(7), given that it contains 8,267 words (as computed by the "Word Count" function of Microsoft Word 2010, which is the word processing program that was used to prepare this brief), excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).


Dated:   December 1, 2014


　　　　　　　　　　　____/s/Mark A. Beckman_____
　　　　　　　　　　　　Mark A. Beckman